665 A.2d 1215

**Thomas L. SMITH and Dolores Smith, Appellants,**

v.

**Pauline WEAVER, Appellee.**

Superior Court of Pennsylvania.

Argued April 26, 1995.

Filed Sept. 27, 1995.

462

Joseph L. Luciana, III, Pittsburgh, for appellants.

James V. Corbelli, Pittsburgh, for appellee.

Before DEL SOLE, KELLY and BROSKY, JJ.

DEL SOLE, Judge:

This is an appeal from an order granting Appellee's preliminary objections and dismissing all eleven counts of Appellants' Complaint, with prejudice. We reverse in part, affirm in part.

The claims made by Appellant were each premised in some manner on a question of who is to be responsible for costs associated with underground storage tanks which were leaking waste materials. The Complaint sets forth the following relevant facts.

Appellants [the buyers] purchased property on which had been operated a gasoline station from Appellee [the seller] in August of 1981. The Sales Agreement listed a total price of $70,000, plus the cost of inventory. The $70,000 price included

$10,000 for the property, $7,000 for equipment, machinery and personal property and $53,000 for the gasoline station building. Specifically listed as equipment were three 4,000 gallon underground storage tanks. In 1991, the buyers undertook to remove the three storage tanks. During excavation two other storage tanks were discovered both of which were leaking water and waste materials. The buyers notified the Commonwealth of Pennsylvania, Department of Environmental Resources [DER] that contaminants and pollutants were discovered in soil which was adjacent to the leaking tanks. The DER responded by requiring the buyers to conduct soil samplings and to dispose of the tanks and contaminated soil. The cost associated with this cleanup activity has been in excess of $70,000.

## Count One

The first count of the Complaint sets forth a claim based on misrepresentation. It alleges that the seller knew or should have known of the existence of the leaking underground tanks at the time that she entered the sales agreement with buyers. By negligently or intentionally failing to disclose the existence of these tanks to them, the buyers allege that the seller misrepresented the condition of the property which induced them to purchase it.

The trial court dismissed this first count on the ground that there was no representation as to the maximum number of storage tanks which were on the premises. The court referred to the language of the Sales Agreement and concluded that the plain and unambiguous meaning of the Agreement is that the buyers purchased everything connected with the gasoline station's operation, including all the storage tanks. In so ruling the court focused on the following provision of the agreement:

The Seller agrees to sell ... a parcel of real property ... having erected thereon a gasoline station ... together with all equipment located on the property more particularly described in Exhibit "B" attached hereto and made part

hereof, together with all inventory located on the Property on the day before Settlement.

Exhibit "B" is an attachment listing "Library Road Property Equipment." "(Three) 4,000 Gallon Steel Tanks" appear as the second item on the list. The trial court concluded that the agreement provided no reason why the buyers would rely on a conclusion that those items listed in Exhibit B were "all" the equipment which they were purchasing. As the trial court viewed it "all equipment located on the property" passed to the buyers and the specific items listed in the exhibit were the minimum amount of equipment included in the purchase price.

In considering the appropriateness of this ruling as well as the court's ruling on each count, we, as an appellate court, must apply the same standard employed by the trial court. *Kyle v. McNamara & Criste*, 506 Pa. 631, 487 A.2d 814 (1985). The material facts set forth in the complaint as well as all inferences reasonably deducible therefrom must be admitted as true. *Id.* The court must determine from the facts averred, whether the law says with certainty that no recovery is possible. *Baker v. Magnetic Analysis Corp.*, 347 Pa.Super. 188, 500 A.2d 470 (1985). If doubt exits whether a demurrer should be sustained, it should be resolved in favor of overruling the demurrer. *Id.*

Where the issue is the interpretation of an unambiguous contract, the court is to resolve the matter as an issue of law. *Rosen v. Empire Valve and Fitting*, 381 Pa.Super. 348, 553 A.2d 1004 (1989). In this case the court viewed the contract as unambiguous, however it is clear to us that such a conclusion was in error. The contract does provide for the conveyance of a parcel of real estate "together with all equipment located on the property," however in that same sentence is the phrase "as more particularly described in Exhibit B." Exhibit "B" is a specifically enumerated list of equipment, which, among other equipment, lists only three underground storage tanks. No mention is made of the other tanks which were later discovered. Contrary to the trial court's reading of this language, we perceive of no reason why the buyers would

expect Exhibit B to be only a "minimum list" of equipment which was to be transferred. The list of equipment contemplated by the parties when negotiating the sale may have effected the purchase price ultimately agreed upon. In this situation we cannot say, as a matter of law, that the agreement covered "all" the equipment including the undisclosed storage tanks. Rather, the jury should determine if the seller knew, or had reason to know of the tanks, and whether the buyers could reasonably rely on any representations contained in the agreement about the number of tanks being sold along with the property.

### Counts Two, Three, Four, Five, Six and Eight

Each of these counts were dismissed by the court on the premises that they could not be maintained since the seller was no longer the owner of the leaking storage tanks. Count Two sets forth a claim for negligence, and Counts Three, Four, Five and Six assert claims for public and private nuisance. Count Eight is a claim for contribution and indemnification and is based on an allegation that the seller abandoned the leaking tanks at the property. With respect to each of these claims the trial court concluded that because of the "unambiguous" language in the sales agreement, the tanks were sold to the buyers in 1981. Based on the conclusion that the seller is not the current owner of the tanks, the court reasoned that the seller owes a duty to no one with respect to the tanks.

As we have stated, the agreement itself is ambiguous regarding the sale of these tanks. The seller maintains, however, that the tanks passed to the buyers regardless of the language of the agreement since it believes they were fixtures on the property.

A fixture is an article in the nature of personal property which has been so annexed to the realty that it is regarded as part and parcel of the land. *Black's Law Dictionary* 574 (5th Ed.1979). In determining the relationship of an article to the land, the decision in *Clayton v. Lienhard,* 312 Pa. 433,

436–437, 167 A. 321, 322 (1933), is often quoted. *See Royal Store Fixture Co. v. Patten,* 183 Pa.Super. 249, 252–253, 130 A.2d 271, 273 (1957). Therein it was said:

> Chattels used in connection with real estate are of three classes: First, those which are manifestly furniture, as distinguished from improvement, and not peculiarly fitted to the property with which they are used; these always remain personalty. Second, those which are so annexed to the property that they cannot be removed without material injury to the real estate or to themselves; these are realty, even in the face of an expressed intention that they should be considered personalty.... Third, those which, although physically connected with the real estate, are so affixed as to be removable without destroying or materially injuring the chattels themselves, or the property to which they are annexed; these become part of the realty or remain personalty, depending upon the intention of the parties at the time of annexation; in this class fall such chattels as boilers and machinery affixed for the use of an owner or tenant but readily removable.

(citations omitted.)

▮ The seller argues that the storage tanks fit within the second category of chattels and are part of the property because to remove them would damage the real estate. The seller's position cannot be adopted, however, on the state of the record before us. Surmise and conjecture can play no part in our decision, and in ruling on preliminary objections we are to accept the facts set forth as true and resolve doubts in favor of overruling a demurrer. *Baker v. Magnetic Analysis Corp.* supra. We cannot say with certainty on the face of this record, at this stage of the case, what effect the removal of these tanks had on the tanks themselves or the property. Therefore, we unable to rule whether or not they are fixtures based upon an analysis of this second category.

Further the seller makes the alternative argument that if the tanks are likened to a boiler and are classified under the third category of chattels, the only reasonable conclusion is that they were intended to be placed there as fixtures. The

third type of chattel described in *Clayton* may or may not be considered part of the realty depending on the intent of the parties. While the court's have held that an objective intent standard should apply when considering this question for purposes of the statute of repose, 42 Pa.C.S.A. § 5536, this same standard does not necessarily apply when considering the question in the more traditional context for the law of fixtures. *See Noll by Noll v. Harrisburg Area YMCA*, 537 Pa. 274, 288, n. 6, 643 A.2d 81 (1994). A more subjective analysis may be appropriate in this situation, and this appears to be what the court's have applied in the past. In *Royal Store Fixture Co. v. Patten, supra.*, the court examined the intent of the parties with regard to a question of whether a frozen custard stand and cooler were intended to be personalty. The court found that the intention that the building should remain personalty was clearly expressed in a conditional sales agreement and the parties in their dealings indicated a similar intent.

In this case the intent of the parties is uncertain. Despite the nature of the chattel and its apparent annexation to the property, the parties did list other storage tanks as part of the "equipment" being transferred for a set price in the overall transaction. This would appear to indicate that the parties considered storage tanks to be personalty. Again, at this stage of the case, when ruling on preliminary objections, we cannot accept the legal conclusion that the storage tanks were fixtures which passed with the property to buyers. As with count one, these counts must as well be referred to a jury to make an ultimate determination based upon the facts presented.

## Count Seven

The trial court also dismissed Count Seven of the Complaint, which set forth a claim based on strict liability. It set forth two reasons in support of its decision. The first we cannot accept because the court held that the claim depended on buyer's current ownership, and for the reasons set forth

above we concluded that a ruling on ownership of the tanks was premature.

■ Secondly, the court ruled that either known or unknown underground storage tanks do not constitute an abnormally dangerous or ultrahazardous condition on the property. With this conclusion we agree.

The buyers would urge us to consider not whether underground tanks are abnormally dangerous, but rather whether underground storage tanks which are leaking a hazardous substance, are abnormally dangerous. By so phrasing the issue the buyers are seeking to have us view the results of the activity, instead of the activity itself. Although a dangerous condition may have later developed, or harm may have occurred, the proper focus is on the activity itself, the storage of potentially hazardous substances in an underground tank.

We liken the present situation with that found in *Melso v. Sun Pipe Line Co.*, 394 Pa.Super. 578, 576 A.2d 999 (1990), where the court considered whether the operation of a petroleum pipeline under a housing development was an abnormally dangerous activity. The court criticized the trial court which focused on the potential for harm which may occur when a gasoline pipeline breaks. The trial court noted that such an occurrence could cause "an 'environmental catastrophe of considerable magnitude.'" *Id.* at 587, 576 A.2d at 1003. This court, on review, found that the transmission on land of natural gas and petroleum products is a common activity in a highly industrialized society. *Id.* We ruled that the trial court erred in determining that the operation of the pipeline was abnormally dangerous. We cited to the strict liability provisions of the Restatement (Second) of Torts, found in sections 519 and 520. It provides:

### § 519. General Principle

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

### § 520. Abnormally Dangerous Activities

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 519 and 520 (1976)

Applying these factors to the situation before us, we conclude that the operation of underground storage tanks at a gasoline service station is not an abnormally dangerous activity. Gasoline and other petroleum products can be stored and dispensed safely with reasonable care, and the storage of these materials in tanks is a common use and is valuable to a modern society. The location of tanks at a gasoline service station is certainly appropriate and although the harm which may result from a leak may be great, this one factor pales in comparison to the others which point in favor of our ruling that the storage of petroleum products in underground storage tanks is not abnormally dangerous. For this reason we affirm the court's dismissal of Count Seven of the Complaint.

### Count Nine

Count Nine alleges a violation of the Hazardous Sites Cleanup Act (HSCA), 35 Pa.S. § 6020.101, et seq. The trial

court found that the Act did not allow for a private cause of action seeking recovery costs associated with a clean-up effort.

Although no Pennsylvania appellate court has yet ruled on this precise question, we are guided in our decision making by the thoughtful and detailed opinions authored by the United States District Court of Pennsylvania. Specifically we refer to the decision in *Toole v. Gould, Inc.,* 764 F.Supp. 985 (M.D.Pa. 1991). The *Toole* court sought to reconcile divergent opinions which appeared on this subject in prior decisions of the district court. *See Lutz v. Chromatex, Inc.,* 725 F.Supp. 258 (M.D.Pa.1989) (*Lutz II* ), *Lutz v. Chromatex, Inc.,* 730 F.Supp. 1328 (M.D.Pa.1989) (*Lutz III* ), (holding that a private cause of action does not exist explicitly or by implication under the Act.), and *General Electric Environmental Services, Inc. v. Envirotech Corporation,* 763 F.Supp. 113 (M.D.Pa.1991) (holding that a private cause of action exists under the Hazardous Sites Cleanup Act.) The *Toole* court ultimately accepted the result reached by the court in *Envirotech* and held that in keeping with the goal of the Act, to promote cleanup of hazardous waste sites, it was appropriate to infer from the words of the statute itself that a private right of recovery exists.

■ Critical to the *Toole* court's decision, and ours, is the language of the Act. Chapter 11, entitled "enforcement and remedies," refers to response costs in § 6020.1101. It provides, in part:

A release of a hazardous substance or a violation of any provision, regulation, order or response approved by the department under this act shall constitute a public nuisance. Any person allowing such a release or committing such a violation shall be liable for the response costs caused by the release or the violation.

. . . . .

35 P.S. § 6020.1101

In reference to this section the *Toole* court remarked: "No specific limitation as to who can sue for response costs under this provision is given nor does it distinguish between govern-

ment versus private causes of action." The scope of liability for such costs is set forth in § 6020.702.

(a) **General rule.**—A person who is responsible for a release or threatened release of a hazardous substance from a site as specified in section 701 [35 § 6020.701 "Responsible person"] is strictly liable for the following response costs and damages which result from the release or threatened release or to which the release or threatened release significantly contributes:

(1) Costs of interim response which are reasonable in light of the information available to the department at the time interim response action was taken.

(2) Reasonable and necessary or appropriate costs of remedial response incurred by the United States, the Commonwealth or a political subdivision.

(3) Other reasonable and necessary or appropriate costs of response incurred *by any other person.*

(4) Damages for injury to, destruction of or loss of natural resources within this Commonwealth or belonging to, managed by, controlled by or appertaining to the United States, the Commonwealth or a political subdivision. This paragraph includes the reasonable costs of assessing injury, destruction or loss resulting from such a release.

35 P.S. § 6020.702. (emphasis added.)

Particularly relevant to the issue before us is the language found in paragraph (3) which refers to the costs incurred "by any other person." We accept the *Toole* court's analysis on the significance of this language. The court stated:

In order to give every word or the statute its full meaning without obtaining an absurd or inconsistent result, the scope of section 702(a)(3) must give a "person" other than the government the right to recovery, otherwise, this section would be redundant and serve no useful purpose. We say "other than the government" since the prior two provisions of the statute allow for government recovery for interim [§ 702(a)(1) ] and remedial [§ 702(a)(2) ] response costs. Reading section 702(a)(3) as also authorizing government

recovery for response costs would be repetitious and would not give sufficient meaning to this provision of the statute. *Toole* at 993.

This reasoning along with the discussion in *Toole* of the legislative intent and the purpose and scheme of the Act, causes us to agree that a private cause of action does exist under the HSCA.

■ The trial court provided, as alternative reasoning for its ruling, that the Act did not apply in this situation because it became effective in 1988, long after the transfer of the property. We disagree and conclude that the provisions of the Act clearly include the seller as a person who is potentially responsible.

Section § 6020.702(a), cited above, refers to "A person who is responsible . . . as specified in section 701." That prior section is titled "Responsible person," and it reads:

> *(a) General rule.*—Except for releases of hazardous substances expressly and specifically approved under a valid Federal or State permit, a person shall be responsible for a release or threatened release of a hazardous substance from a site when any of the following apply:
>
> (1) The person owns or operates the site:
>
> (i) when a hazardous substance is placed or comes to be located in or on a site
>
> (ii) when a hazardous substance is located in or on the site but before it is released; or
>
> (iii) during the time of the release or threatened release.

35 P.S. § 6020.701

The terms "owner or operator" are defined in the definitional section of the Act, 35 P.S. § 6020.103. It includes in its definition "A person who owns or operates or *has owned or operated a site,* or otherwise controlled activities at a site." 35 P.S. § 6020.103. (emphasis added.) Thus, the clear language of the Act makes it apparent that it is meant to include, as

responsible persons, those who have previously owned or operated a site.

■ The final matter which needs to be addressed concerning the viability of a cause of action brought under the Act is the seller's suggestion that DER involvement is a prerequisite to any private action, and that certain procedural requirements of the Act must be complied with. Seller claims that DER involvement is mandated by Section 1301(a) of the Act which provides that an owner "shall not be subject of enforcement orders or the cost recovery provisions of this Act until the Department has instituted an administrative or judicial enforcement action ... and the owner ... has failed to comply." 35 P.S. § 6020.1301(a).

Such an interpretation of the Act, which would require prior DER involvement even where recovery is sought by a private party, would frustrate the purpose of the Act. Those who take action to clean up hazardous sites would be penalized for acting promptly and not first awaiting enforcement action by the DER. Because the purpose of the Act is to promote cleanup of a site, we cannot accept an interpretation of this section which would be counterproductive to this goal. *See Toole v. Gould, Inc., supra.* and 35 P.S. § 6020.102 (Declaration of policy.)

Further, subsection (b) of § 6020.1301 reinforces our interpretation that the provisions of subsection (a) are meant to apply to cases where the DER is seeking recovery. It provides that "The department may not initiate enforcement orders nor apply the cost recovery provisions of this act" unless certain conditions exist. There is nothing in this section of the Act which would cause us to interpret it as applying when a private cause of action is brought for recovery.

■ We likewise reject seller's claim that the buyers' have failed to comply with procedural requirements of the Act found in § 6020.505 and 506. These provisions require the development of an administrative record (506) and the selection of a remedial response based upon that record (505).

This same argument was presented before, and rejected by, the district court in *Reading Co., v. City of Philadelphia,* 823 F.Supp. 1218 (E.D.Pa.1993). We find the court's reasoning persuasive on this matter:

> Sections 505 and 506 are clearly designed to apply to the DER and are based on administrative law principles. To compel private parties to comply with detailed requirements obviously designed for an administrative agency seems patently absurd. For instance, section 506(f) requires 'the department [DER]' to 'maintain a docket listing of all the items which form the administrative record' and to 'notify a person submitting a comment that it has been entered on the docket.' 35 Pa.Stat.Ann. § 6020.506(f). There is no reason to force private parties to follow this directive.

*Reading* at 1244.

We agree, and hold that these sections were plainly meant only to apply to DER actions and have no bearing on private party cost recovery actions.

Accordingly, for these reasons we reverse the trial court's ruling dismissing Count Nine of the Complaint and rule that the buyers may go forward with their action under the Hazardous Substances Cleanup Act.

## Count Ten

Count Ten is labeled "Declaratory Judgment" and seeks to have the court declare that the seller is responsible for the payment of all future costs which may be necessary because of damage caused by the leaking tanks. The trial court dismissed this count because it found it to be dependant upon the other counts, none of which survived according to its reasoning. While we too find that Count Ten should be dismissed, we do so for a different reason. Recovery for past, present and future damages should be brought in conjunction with the specific claims which are to be presented before a jury. It is not appropriate to seek to recover for future losses in a separate declaratory judgment action.

Count Eleven

The final cause of action, pled in the Amended Complaint, seeks recovery under the Pennsylvania Storage Tank and Spill Prevention Act (STSPA), 35 P.S. § 6021.101 *et seq.* This Act was designed to prevent the occurrence of releases from storage tanks through a regulatory scheme, to provide liability for damages sustained as a result of a release and to require prompt cleanup. 35 P.S. § 6021.102(b). In *Centolanza v. Lehigh Valley Dairies, Inc.,* 540 Pa. 398, 658 A.2d 336 (1995) it was held that a private right of action exists under the Pennsylvania Storage Tank and Spill Prevention Act to collect costs for cleanup and diminution in property value. However, the trial court in this case held that the buyers' claim could not proceed because they did not allege that they complied with the written notice requirements of the Act. At issue is the language of Section 1305(d):

(d) **Notice of private action.**—No action pursuant to subsection (c) [private actions] may be commenced prior to 60 days after the plaintiff has given notice, in writing, of the violation to the department and to any alleged violator. 35 P.S. § 6021.1305(d).

Because it was found that the Complaint failed to aver that written notice of an alleged violation of the Act was provided to the DER or the seller 60 days prior to the commencement of the action, this count was dismissed.

The purpose of this notice requirement is to bring about a prompt cleanup. By requiring notification it is hoped that a cleanup program will begin before a private action is commenced in an effort to force such cleanup. However, in a case such as this, where the cleanup is being done by another, the property owner, no purpose is served by requiring notice. Subparagraph (e) of 35 P.S. § 6021.1305 recognizes that notice is not required in every situation. Where there exists an imminent threat to the health or safety of the plaintiff, or where the plaintiff's legal interest would be immediately affected, an action may be commenced immediately upon written notification to the department. 35 P.S. § 6021.1305(e). As

478

the trial court recognized, paragraph 16 of the First Amended Complaint does plead that the DER was notified of the contaminants and pollutants. The following paragraph states that the DER ordered the buyers to clean up the site. We conclude that the allegations of the Complaint are sufficient to allow Count Ten to go forward. Even if we were to rule otherwise, we accept the buyers' position that they should have been allowed to amend their complaint to make the proper allegations.

The trial court also set forth as alternative grounds for its ruling that the demurrer should be granted because the seller was not the "owner" under the STSPA. The term owner is defined in Section 6021.103 as one who owned a storage tank "on or after November 8, 1984" or one who owned it "at the time all regulated substances were removed when removal occurred prior to November 8, 1984." Because we have already discussed the question and have found that "ownership" of the tanks can not be determined at this stage of the proceedings, this basis for dismissal of Count Ten cannot be accepted.

## Conclusion

In accordance with the above, we reverse the trial court's ruling dismissing Counts One, Two, Three, Four, Five, Six, Eight, Nine, and Eleven of the buyer's Complaint. Appellants must be permitted to proceed with these claims. Counts Seven and Ten, however, were properly stricken by the trial court and we affirm the court's grant of a demurrer on these claims.

Affirmed in part, reversed in part. Case remanded for further proceedings. Jurisdiction relinquished.