David DIFFENDERFER

v.

Richard STANER and Luella Staner, h/w and Steven Staner.

Appeal of Richard Staner and Luella Staner, Appellants.

Superior Court of Pennsylvania.

Argued March 4, 1998.

Filed Nov. 12, 1998.

Reargument Denied Jan. 20, 1999.

---

**1104**

Joseph G. Muzic, Lancaster, for appellants.

Thomas G. Klingensmith, Lancaster, for appellee.

Before CAVANAUGH, POPOVICH and FORD ELLIOTT, JJ.

FORD ELLIOTT, J.:

Appellants, lessors of a dairy farm, bring this appeal from a judgment entered in favor of David Diffenderfer, the farm's lessee. Because we find that the trial court erred as a matter of law when it allowed the strict liability and nuisance claims against appellants to go to the jury, we vacate the judgment and enter judgment n.o.v. as to those two counts. We also remand for a new trial as to Richard Staner on the negligence

count.[1] Appellants claim trial court error in the denial of their post-verdict motions; therefore, we first set forth our proper standard and scope of review.

The Pennsylvania Supreme Court set forth the proper standard for reviewing a denial of motion for judgment n.o.v. in *Wenrick v. Schloemann–Siemag*, 523 Pa. 1, 564 A.2d 1244 (1989), as follows:

> [T]he proper scope of review for an appellate court examining a denial of judgment n.o.v., according to the longstanding rule, is whether, reading the record in the light most favorable to the verdict winner and granting him the benefit of every favorable inference, there is sufficient competent evidence to support the verdict.

*Id.* [at 4], 564 A.2d at 1246.

*Vargo v. Koppers Co.*, 452 Pa.Super. 275, 278, 681 A.2d 815, 817 (1996), reversed on other grounds, 552 Pa. 371, 715 A.2d 423 (1998). Additionally:

> There are two bases upon which a j.n.o.v. can be entered: one, the movant is entitled to a judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant.

*Simmons v. Pacor, Inc.*, 543 Pa. 664, 672, 674 A.2d 232, 236 (1996). In contrast:

> Appellate review of a trial court's decision to grant or deny a new trial is subject to an abuse of discretion standard. *Chiaverini v. Sewickley Valley Hospital*, 409 Pa.Super. 630, 598 A.2d 1021 (1991). The power to grant a new trial lies inherently with the trial court and we will not reverse its decision absent a clear abuse of discretion or an error of law which controlled the outcome of the case. *Spang & Co. v. U.S. Steel Corp.*, 519 Pa. 14, 545 A.2d 861 (1988).

*Ferguson v. Panzarella*, 445 Pa.Super. 23, 27, 664 A.2d 989, 991 (1995), *reversed on other grounds*, 549 Pa. 109, 700 A.2d 927 (1997). With these standards in mind, we set forth the factual and procedural history of the case.

---

1. Steven Staner did not file an appeal.

During the 1970's, Steven Staner, son of Luella and Richard Staner, farmed his parents' farm. In 1978, Steven purchased Thimet, a highly toxic insecticide containing phorate, used to kill corn rootworm. In 1980, parents and son entered into a partnership agreement to farm the Staner farm. The partnership was dissolved in 1981 and Steven ceased his involvement in farming. From 1981 until the present, no one used the Thimet. In 1985, the United States Environmental Protection Agency listed phorate as a restricted-use pesticide, which could only be purchased by a person with a restricted-use license. (R.R. at 311a.)

In May of 1991, David Diffenderfer ("tenant") entered into a lease agreement with Mr. and Mrs. Staner ("lessors") to lease the dairy farm, consisting of a dairy barn, a hay barn, a pole barn in which equipment was stored, and a house. (R.R. at 63a.) Before tenant took possession, Mr. Staner auctioned off most of the equipment in the pole barn with the exception of a corn picker. (R.R. at 132a–133a.)

In July 1991, tenant took possession of the farm, moving his farm equipment and fuel into the pole barn, and bringing or purchasing a total of 90 head of cattle. (R.R. at 134a–135a, 119a–120a.) In February 1992, tenant's farmhands dumped a load of ear corn in the pole barn because the entrance to the hay barn was blocked. The corn was dumped seven or eight feet from some granular material that had been spilled on the dirt floor of the barn ever since tenant moved in, which he assumed was fertilizer. (R.R. at 84a–86a, 139a–140a.) Tenant had the corn ground at the local feed store.

On Wednesday, February 26, 1992, tenant took the last of the corn to the feed store to be ground, and then had his farmhand feed it to the cows while tenant began milking. (R.R. at 89a–92a.) The cows became violently ill. Fifty-seven cows died, and the rest had to be sold at less than market value because they could no longer be used for milking, having been contaminated. (R.R. at 93a–100a, 107a–109a.)

David Scott, an agronomic products inspector employed by the Pennsylvania Department of Agriculture, was assigned to investigate the incident. He first visited the farm on February 28, 1992. When he returned to the farm on March 12, 1992 to retrieve statement forms he had left, he also examined a pile of granular material on the floor of the pole barn. In the pile, he found a scrap of paper bearing directions for applying a pesticide. (R.R. at 305a–307a.) Laboratory tests conducted on samples of the corn and soil sent for analysis by the milk sanitarian, Donald Lerch, revealed this pesticide contained phorate. (R.R. at 285a–286a, 308a.)

In his answer to tenant's request for admissions, Steven Staner stated that he purchased one or two 80–pound bags of Thimet in 1978 and stored the remainder of the single bag of Thimet adjacent to a Massey Harris corn picker in the pole barn on the Staner farm. (R.R. at 565a.) During David Scott's March 12, 1992 visit to the farm, Richard Staner provided the following statement:

> I, Richard Staner, own the farm Dave Diffenderfer rents. The insecticide was stored by a corn picker for at least 15 years. Corn picker wasn't used for that amount of time. I sold my machinery in June, 1991, and the storage [area] was cleaned up. The corn picker was not moved. Partial bag was forgotten about with the junk piled all around.

R.R. at 318a. Richard Staner also said he thought the bag may have been knocked over or run over at some point, but was unsure. (R.R. at 321a.)

Tenant sued lessors as well as Steven Staner, bringing claims of negligence, nuisance and strict liability against all three. (R.R. at 20a–25a.) The trial court granted Steven Staner's motion for compulsory nonsuit as to the strict liability and nuisance counts, but denied lessors' motions for compulsory nonsuit and directed verdict. As a result, the trial court instructed the jury on negligence as to all parties, and on nuisance and strict liability as to lessors only.

On April 4, 1996, the jury returned a verdict in favor of tenant in the amount of $119,200. In its answers to interrogatories, the jury found lessors Richard and Luella Staner strictly liable, and found that their

conduct constituted a nuisance. The jury also found that lessor Richard Staner and Steven Staner were negligent, and apportioned 30% of the negligence to Richard and 70% to Steven. Lessors and Steven timely filed post-verdict motions for j.n.o.v. and for a new trial. These motions were denied and lessors filed this timely appeal.

We first address lessors' issues A and E, as they are interrelated. In issue A, lessors claim that tenant failed to meet his burden of proving that the storage of phorate was an abnormally dangerous activity for which lessors could be held strictly liable. In issue E, lessors claim the trial court erred when it instructed the jury that "failure to control the leakage of the stored pesticide"[2] was an ultrahazardous activity as a matter of law, for which lessors could be held strictly liable if the jury determined that this failure was a substantial factor in bringing about tenant's harm. (R.R. at 671a.) Because we find that the trial court erred in submitting the strict liability claim to the jury, we likewise find that the trial court erred in its jury instruction. Furthermore, even if we were to find that the strict liability claim was properly submitted to the jury, we would find error on the part of the trial court because its instruction focused the strict liability claim on the leaking of the pesticide, not on its storage.

Our findings are based in part upon this court's recent decision in *Smith v. Weaver*, 445 Pa.Super. 461, 665 A.2d 1215 (1995). In *Smith*, the Smiths purchased property in 1981 on which Weaver had operated a gasoline station. Specifically included in the purchase price of $70,000 were three 4,000–gallon underground storage tanks. In 1991, the Smiths undertook removal of the tanks, at which time they discovered two additional tanks, both of which were leaking water and waste materials. Further inspection by the Pennsylvania Department of Environmental Resources revealed contaminants and pollutants in the soil surrounding the tanks. The DER ordered the Smiths to dispose of the tanks and the contaminated soil at a cost of approximately $70,000. *Id.* at 464–467, 665 A.2d at 1216–1217.

The Smiths sued Weaver, alleging *inter alia*, strict liability because the unknown underground storage tanks were abnormally dangerous. According to the Smiths' theory of the case, underground storage tanks that are leaking a hazardous substance are abnormally dangerous. *Id.* at 469–471, 665 A.2d at 1219. The trial court dismissed this count, and this court affirmed the dismissal. As the *Smith* court opined:

> The buyers would urge us to consider not whether underground tanks are abnormally dangerous, but rather whether underground storage tanks which are leaking a hazardous substance, are abnormally dangerous. **By so phrasing the issue the buyers are seeking to have us view the results of the activity, instead of the activity itself.** Although a dangerous condition may have later developed, or harm may have occurred, **the proper focus is on the activity itself, the storage of potentially hazardous substances** in an underground tank.

*Id.* (emphasis added).

The *Smith* court relied in part on this court's decision in *Melso v. Sun Pipe Line Co.*, 394 Pa.Super. 578, 576 A.2d 999 (1990), *appeal denied*, 527 Pa. 667, 593 A.2d 842 (1991). In *Melso*, the trial court found as a

---

**2.** The complete jury instruction on this issue follows:

> First let me explain to you the strict liability. This arises from what is known as ultrahazardous activity. Anyone who carries on an ultrahazardous activity, **and I am ruling, as a matter of law, includes the failure to control the leakage of the stored pesticide here involved**, which was engaged in, according to the Plaintiff by the Defendants, Richard Staner and Luella Staner, is liable for any damage or injury caused by that activity, even though the Staners used the utmost care to prevent any harm from occurring.

> In this instance, we apply the rule of absolute liability, which imposes legal responsibility on the Defendants, Richard and Luella Staner, regardless of the amount of care they have exercised in the conduct of this ultrahazardous activity.

> Therefore, **if you find that the failure to control the leakage of this stored pesticide by the Defendants was a substantial factor in bringing about the harm to the Plaintiffs**, your verdict must be in favor of the Plaintiff and against the Defendants, Richard and Luella Staner.

R.R. at 670a–671a (emphasis added).

matter of law that operating a petroleum pipeline under a housing development was an abnormally dangerous activity. This court criticized the trial court, however, because it focused on the harm that may occur when a break occurs in a petroleum pipeline running under a housing development. *Id.* at 585–587, 576 A.2d at 1003. According to the *Melso* court, the pipeline, which was in place before the housing development was built, was not abnormally dangerous because it was a common activity in a highly industrialized society and was not inappropriately located at the time it was installed. *Id.*

▇▇▇ We likewise find that storage of a pesticide, even a controlled pesticide, on a farm is not an abnormally dangerous activity as a matter of law. "The court must determine as a matter of law whether an activity is abnormally dangerous so that strict liability will be imposed." *Id.,* citing *Albig v. Municipal Authority of Westmoreland County*, 348 Pa.Super. 505, 502 A.2d 658 (1985). The parties and the trial court all rely on the Restatement (Second) of Torts §§ 519 and 520 (1977) in their analyses of this issue. We have found no Pennsylvania supreme court case adopting these sections of the *second* Restatement.[3] Nevertheless, several panels of this court have employed these sections in their analyses; therefore we shall do likewise. These sections provide:

### § 519. General Principle

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

. . . .

### § 520. Abnormally Dangerous Activities

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts §§ 519, 520 (1977).

We next analyze the facts before us against the factors set forth in § 520. Subsection (a) requires a high degree of risk to the person, land or chattels of others. We do not believe that storing a bag of pesticide in one's own pole barn constitutes such a high degree of risk to others. Additionally, we need not decide whether a subsequent owner or lessee of the premises may be considered "others" for purposes of this subsection because our resolution of the other factors compels us to conclude that storing Thimet is not an abnormally dangerous activity.

Subsection (b) requires that the harm that will result from the activity be great, and we readily conclude, based on the fate of tenant's cattle, that there is a potential for serious harm when Thimet is not stored with due

---

**3.** Contrary to the parties' assertions, the supreme court in *Haddon v. Lotito*, 399 Pa. 521, 161 A.2d 160 (1960) and *Federoff v. Harrison Construction Co.*, 362 Pa. 181, 66 A.2d 817 (1949) employed the first Restatement in their analyses, the second Restatement not having yet been published. The first Restatement's § 519 provided:

[O]ne who carries on an ultrahazardous activity is liable to another whose person, land or chattels the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto from

that which makes the activity ultrahazardous, although the utmost care is exercised to prevent harm.

*Albig, supra* at 512, 502 A.2d at 662, quoting Restatement of Torts § 519 (1938). "An ultrahazardous activity was defined as one which (1) necessarily involves a risk of serious harm to the person, land, or chattels of others which cannot be eliminated by the exercise of utmost care, and (2) is not a matter of common usage." *Albig, supra* at 512, 502 A.2d at 662, citing Restatement of Torts § 520 (1938).

care. The care with which the product is stored is not, however, at issue when determining whether storage is an abnormally dangerous activity because the activity in question is storage, not careful storage. *See* § 519(1), *supra* (liability attaches to one carrying on an abnormally dangerous activity "although he has exercised the utmost care to prevent the harm."). Lack of due care may raise a negligence question but does not render an activity abnormally dangerous.

We likewise find that all of the remaining factors of § 520 weigh against finding that storing a highly toxic pesticide in a machine shed or barn on a farm constitutes an abnormally dangerous activity. Tenant's own expert, Dr. Robert H. Poppenga, testified as to the proper manner in which to store phorate safely. (R.R. at 463a.) David Scott, the agronomic products inspector for the Commonwealth whose testimony we discussed earlier, testified that the federal and state laws regulating the use of phorate require that it be used according to label directions, including storage directions. (R.R. at 311a–315a.) Mr. Scott also testified that his department would recommend that classified pesticides be stored in a dry place with some type of floor that could be cleaned in the event of a spill, and that they be locked out of reach of children, animals or unauthorized persons. (R.R. at 315a.) Thus, we find that the risk of storing Thimet can be eliminated with the exercise of reasonable care, and that subsection (c) of § 520 does not support tenant's claim.

Evidence was also presented at trial that phorate was widely used prior to its classification in 1985. A letter from the manufacturer of Thimet, introduced into evidence during Dr. Poppenga's testimony, indicated that in 1979, of the 36 million acres of farmland treated with a pesticide, 4 million were treated with Thimet. (R.R. at 737a, 739a.) Tenant introduced no evidence indicating that either phorate in general or Thimet in particular have been less widely used since being classified.[4] As a result, we agree with lessors that, at best, insufficient evidence existed to support this factor. As a result,

subsection (d) of § 520 does not support tenant's claim.

Using the same analysis, we find that the only evidence at trial as to subsection (f), the extent to which the harm caused by the activity outweighs its benefit to the community, was the letter referred to above. That letter indicated that without Thimet, the community would incur higher prices for corn as a result of poorer crop yields and the use of more expensive pesticides. Farmers would likewise feel the adverse economic impact. The letter also indicated that five of the six pesticides used to treat corn rootworm were under consideration for restricted use, thereby intensifying the impact. Again, tenant presented no evidence that the value of Thimet to the community, in terms of lower prices and more successful farming, was outweighed by the potential harm associated with storing Thimet on a farm. Thus, this factor does not support tenant's claim.

Finally, while tenant offered evidence that Thimet should be stored in a dry place, off the ground and out of reach of children and animals, tenant offered no evidence that storing Thimet on a farm in a pole barn used as a machine storage shed was inappropriate. In fact, the only evidence at trial indicated that it was the most appropriate place on the Staner farm to store the Thimet. (R.R. at 337a–338a.) Again, the care with which lessors stored the Thimet in the pole barn may go to issues of negligence, but does not render the activity of storage itself abnormally dangerous. As a result, we find that subsection (e) of § 520 does not support tenant's claim.

We find support for our analysis in the *Smith* court's application of the § 520 factors to the facts before it:

> Applying these factors to the situation before us, we conclude that the operation of underground storage tanks at a gasoline service station is not an abnormally dangerous activity. Gasoline and other petroleum products can be stored and dispensed safely with reasonable care, and the storage of these materials in tanks is a com-

---

**4.** The letter did indicate that classification would adversely affect the use of Thimet; however, this was not evidence that Thimet was not in fact commonly used after its use was restricted.

mon use and is valuable to a modern society. The location of tanks at a gasoline service station is certainly appropriate and although the harm which may result from a leak may be great, this one factor pales in comparison to the others which point in favor of our ruling that the storage of petroleum products in underground storage tanks is not abnormally dangerous. *Smith, supra* at 471, 665 A.2d at 1220. *See also Albig, supra* (applying the second Restatement § 520 factors and finding that storing water in a reservoir was not an abnormally dangerous activity because the community value of the reservoir outweighed its potentially dangerous qualities); *cf. First Nat'l Bank of Albuquerque v. Nor–Am Agricultural Products*, 88 N.M. 74, 79, 537 P.2d 682, 687 (1975) (applying the first Restatement and finding that treating seed grain with a highly toxic disinfectant is not an ultrahazardous activity because adequate warnings not to feed the grain to livestock would eliminate the danger), *cert. denied sub nom. New Mexico Mill & Elevator Co. v. First Nat'l Bank*, 88 N.M. 29, 536 P.2d 1085 (1975). Because storing thimet in the barn is not an abnormally dangerous activity as a matter of law, we grant j.n.o.v. as to lessors on tenant's strict liability claim.

We turn next to lessors' claim that the trial court erred when it denied their motion for post-trial relief because tenant failed to introduce sufficient evidence that storing the Thimet constituted a nuisance. As with sections 519 and 520 of the Restatement, the Pennsylvania supreme court adopted § 822 of the first Restatement with regard to a private nuisance, *Waschak v. Moffat*, 379 Pa. 441, 447–449, 109 A.2d 310, 314 (1954), but never adopted that section of the second Restatement. Nevertheless, this court has repeatedly employed the second Restatement's analysis when addressing issues of private nuisance. *See, e.g., Karpiak v. Russo*, 450 Pa.Super. 471, 676 A.2d 270 (1996); *Jones v. Wagner*, 425 Pa.Super. 102, 624 A.2d 166 (1993), *appeal denied*, 536 Pa. 626, 637 A.2d 286 (1993); *Harford Penn–Cann Serv. v. Zymblosky*, 378 Pa.Super. 578, 549 A.2d 208

(1988). That section provides in relevant part that "One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land[.]" Restatement (Second) of Torts § 822 (1977).

We need not pursue this analysis very far because we find as a matter of law that a tenant cannot bring a private nuisance complaint against a landlord out of possession. As our supreme court stated more than sixty years ago:

> The doctrine of 'condition amounting to a nuisance[ ]' ... does not apply as between landlord and tenant[.]
>
> ....
>
> The doctrine ... is confined to third persons or strangers to the premises, those 'either the owners or occupants of near-by property, persons temporarily on such property, or persons on a neighboring highway or other public places[.]' The word 'nuisance,' as used in the law, implies the transmission of the effects beyond the boundaries of the land upon which the objectionable condition exists. As Chief Justice GIBSON said in *Knight v. Abert*, 6 Pa. 472 [1847], 'A man must use his property so as not to incommode his neighbor; but the maxim [sic utere tuo ut alienum non laedas][5] extends only to neighbors who do not interfere with it or enter upon it.'

*Harris v. Lewistown Trust Co.*, 326 Pa. 145, 153–154, 191 A. 34, 38 (1937), *overruled in part on other grounds, Reitmeyer v. Sprecher*, 431 Pa. 284, 243 A.2d 395 (1968). We recognize that the *Harris* court's holding, which prevented recovery by a lessee injured due to a condition the landlord promised to repair, is no longer good law. Nevertheless, we agree with the Third Circuit Court of Appeals that "insofar as [*Harris* ] stands for the proposition that salutary limitations on vendor or lessor liability to vendees and lessees cannot be circumvented by asserting a breach of a duty owed to third parties, *Har-*

---

**5.** "Use your own property in such a manner as not to injure that of another." Black's Law

Dictionary 1238 (5th ed.1979).

*ris* reflects sound tort theory." *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 314 n. 7 (3rd Cir. (Pa.) 1985), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985).

Furthermore, we agree with the Third Circuit Court of Appeals that precluding private nuisance claims by subsequent owners or tenants for conditions existing on the very land transferred is sound public policy. As that court opined:

> We believe that this result is consonant with the historical role of private nuisance law as a means of efficiently resolving conflicts between neighboring, contemporaneous land uses. All of the very useful and sophisticated economic analyses of private nuisance remedies published in recent years proceed on the basis that the goal of nuisance law is to achieve efficient and equitable solutions to problems created by discordant land uses. In this light, nuisance law can be seen as a complement to zoning regulations ... and not as an additional type of consumer protection for purchasers of realty. Neighbors, unlike the purchasers of the land upon which a nuisance exists, have no opportunity to protect themselves through inspection or negotiation.

*Id.* at 314 (citations and footnotes omitted).

Tenant argues that *Philadelphia Electric* is distinguishable because it involved a sale of land, not a lease; therefore the court focused on the public policy behind the doctrine of *caveat emptor* and the market forces applicable to sales when it found that an action for nuisance cannot lie against the seller by the purchaser. (Tenant's brief at 13.) We disagree because we find that the doctrine of *caveat emptor* applies to leases as well as sales. As our supreme court stated in *Harris, supra:*

> We have held repeatedly that a tenant takes the property as he finds it, with all existing defects which he knows or can ascertain by reasonable inspection.... Where the entire possession and enjoyment of property are transferred by landlord to tenant, the rule of caveat emptor applies.

*Harris, supra* at 149–150, 191 A. at 36 (footnote and citations omitted). Because tenant cannot as a matter of law bring a private nuisance claim under the circumstances presented here, we grant j.n.o.v. to lessors on this claim.

■ We turn next to lessors'[6] claim that the trial court erred in denying post-verdict motions because tenant presented insufficient evidence of negligence, and specifically of causation, to support the jury's verdict. Because our review of the record indicates sufficient evidence of causation to support the jury's verdict, we cannot find as a matter of law that Richard Staner was entitled to j.n.o.v. as to this count. *See, e.g.,* R.R. at 285a–286a, 308a.

■ We need not address lessors' evidentiary claim, however, because we find it necessary to remand for a new trial on negligence. Our review of the record, and in particular the trial court's erroneous charge to the jury that leaking Thimet was an abnormally dangerous activity as a matter of law, compels us reluctantly to conclude that this error of law may well have controlled the outcome of the case. *Stewart v. Motts*, 539 Pa. 596, 605–607, 654 A.2d 535, 540 (1995) (we review a trial court's charge to the jury for an abuse of discretion or error of law that controlled the outcome of the case). "Error in a charge is sufficient ground for a new trial, if the charge as a whole ... has a tendency to mislead or confuse rather than clarify a material issue." *Id.*

Judgment n.o.v. is entered in favor of lessors/appellants Richard and Luella Staner as to strict liability and nuisance. Judgment is vacated and case is remanded for a new trial against Richard Staner only as to negligence. Jurisdiction is relinquished.

CAVANAUGH, J., notes his dissent.

---

**6.** We recognize that tenant did not include Luella    Staner in his negligence count.