**Nolen Scott ELY, et al., Plaintiffs**

v.

**CABOT OIL & GAS CORPORATION, et al., Defendants.**

No. 3:09–cv–2284.

United States District Court, M.D. Pennsylvania.

Filed April 23, 2014.

William S. Berman, Marc J. Bern, Tate J. Kunkle, Kevin J. Lawner, Napoli Bern Ripka, LLP, Marlton, NJ, for Plaintiffs.

Ellen C. Brotman, Montgomery McCracken Walker & Rhoads LLP, Philadelphia, PA, for Carly Jannetty, Interested Party.

Jennifer J. Walsh, McNees Wallace & Nurick LLC, Scranton, PA, for Special Master Jennifer Walsh Clark.

Amy L. Barrette, Jeremy A. Mercer, Fulbright & Jaworski LLP, Canonsburg, PA, Richard J. Wilson, Stephen C. Dillard, William D. Wood, Fulbright & Jaworski LLP, Houston, TX, for Defendants.

### ORDER

JOHN E. JONES III, District Judge.

**AND NOW,** upon consideration of the Report and Recommendation of Chief

United States Magistrate Judge Martin C. Carlson (Doc. 489), recommending that the Defendants' Motion for Summary Judgment on the Plaintiffs' claims for strict liability (Doc. 386) be granted, and, after an independent review of the record, and noting that Plaintiffs filed objections[1] (Docs. 490 and 491) to the report on January 23, 2014 to which the Defendants responded (Doc. 492), and the Court finding Judge Carlson's analysis to be extremely thorough, well-reasoned, and fully supported by the record, and the Court further finding Plaintiffs' objections to be without merit and squarely addressed by the Magistrate Judge within his report,[2] **IT IS HEREBY ORDERED THAT:**

1. The Report and Recommendation of Magistrate Judge Carlson (Doc. 489) is **ADOPTED** in its entirety.

2. Defendants' Motion for Summary Judgment on Plaintiffs' strict liability claims (Doc. 386) is **GRANTED** and judgment is granted in favor of the Defendants on those claims as asserted by Plaintiffs.

## *REPORT AND RECOMMENDATION*

MARTIN C. CARLSON, United States Magistrate Judge.

### I. *INTRODUCTION*

In this case we are invited to take a step which no court in the United States has chosen to take, and declare hydraulic fracturing to be an ultra-hazardous activity that gives rise to strict tort liability. This lawsuit was initiated on November 19, 2009, by a group of 44 plaintiffs who collectively filed suit to recover damages for injuries and property damage allegedly suffered as the result of the defendants' natural gas drilling operations in Dimock Township, Susquehanna County, Pennsylvania. Subsequent to this case being filed, a number of the plaintiffs reached settlement agreements with the defendants, and at this juncture only 12 plaintiffs remain in the case. Among those plaintiffs are Nolen Scott Ely and Monica L. Marty–Ely, individually, and as parents and natural guardians of their three minor children (the "Elys"); Nolen Scott Ely, as Executor for the Estate of Kenneth R. Ely ("Estate"); and Ray and Victoria Hubert, individually, and as the parents and natural guardians of one minor child, and a child who has since reached the age of majority, Angel Hubert ("Huberts") (collectively, "Plaintiffs").

The claims of the Plaintiffs are now subject to multiple pending dispositive motions filed by defendants Cabot Oil & Gas Corporation ("Cabot") and GasSearch Drilling Services Corporation ("GDS")

---

**1.** Where objections to a magistrate judge's report and recommendation are filed, the court must perform a *de novo* review of the contested portions of the report. *Supinski v. United Parcel Serv.,* Civ. A. No. 06–0793, 2009 WL 113796, at *3 (M.D.Pa. Jan. 16, 2009) (citing *Sample v. Diecks,* 885 F.2d 1099, 1106 n. 3 (3d Cir.1989); 28 U.S.C. § 636(b)(1)(c)). "In this regard, Local Rule of Court 72.3 requires 'written objections which ... specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for those objections.' " *Id.* (citing *Shields v. Astrue,* Civ. A. No. 07–417, 2008 WL 4186951, at *6 (M.D.Pa. Sept. 8, 2008)).

**2.** We wholly agree with the Magistrate Judge's determination that, based on an analysis of the six factors set forth in the Restatement (Second) of Torts §§ 520 (1977), hydraulic fracturing does not legally qualify as an ultra-hazardous activity giving rise to strict tort liability. Moreover, and as noted by Magistrate Judge Carlson, no court in the United States has chosen to declare that hydraulic fracturing is an ultra-hazardous activity and thus subject to strict tort liability, and we shall decline to accept the Plaintiffs' invitation to depart from the nation-wide jurisprudence on this point.

(collectively, "Defendants"). In the motion currently before the Court, the Defendants have moved for summary judgment on the Plaintiffs' claims that natural gas drilling operations and hydraulic fracturing, commonly referred to as "fracking", constitute abnormally dangerous activities under Pennsylvania law, and therefore should be subject to strict liability. (Doc. 386.) The motion has been fully briefed and is ripe for disposition.

Although questions regarding fracking's safety appear with some regularity in the public arena, and while debate on this area of natural resource development may continue to roil in the public forum for some time, the Plaintiffs have failed to substantiate their contention that the natural gas drilling activities, including hydraulic fracturing at issue in this case, are so inherently dangerous that they should be deemed ultrahazardous activities subject to strict liability. Moreover, review of the law in this field shows that for decades, courts have uniformly refused to find that oil and natural gas drilling and related activities are ultra hazardous or abnormally dangerous, and thus have found that such activities are not subject to strict liability under tort law. Instead, courts consistently have found that claims for property damage and personal injury allegedly resulting from natural gas drilling operations are governed by the more traditional negligence principles.

Accordingly, for the reasons that follow, it is recommended that the Court decline the Plaintiffs' invitation to become the first court in this or any other jurisdiction to conclude that such natural gas drilling operations constitute abnormally dangerous activities, should find as a matter of law that natural gas drilling operations and hydraulic fracturing are not abnormally hazardous activities on the basis of the record developed in this case, and grant summary judgment in the defendants' favor on this specific claim. Plaintiffs' claims regarding the alleged damage to their property and injuries that they claim to have experienced as a result of the Defendants' natural gas activities should continue to be limited to, and considered against, the standards governing negligence under Pennsylvania law, principles which historically do not extend strict liability to these activities.[1]

## II. *BACKGROUND*

On September 12, 2006, Kenneth R. Ely granted an Oil and Gas Lease to Cabot, as lessee ("Estate Lease"), "for the purpose of exploring by geophysical and other methods, drilling, and operating for and producing oil, gas," and other minerals on his property, as more fully defined in paragraph 1 of the Estate Lease. (Doc. 387, Def. Statement of Undisputed Facts, ¶ 9 (hereafter "Def. SMF ¶ —"); Decl. of Jeffrey Keim, Doc 389, Appendix ("App.") A & Ex. A thereto, at ¶ 1.) On May 20, 2009, Kenneth Ely died and his son, Nolen Scott Ely, was appointed as executor of the Estate, as provided for in Kenneth Ely's will. (Second Am. Compl., ¶ 13.) Nolen Scott Ely does not reside on the property, and instead the only resident on the Estate Property is Kenneth Ely's widow, Emmagene Samoy–Ely, who has reached her own settlement with the Defendants. (Doc. 387, Def. SMF ¶¶ 11–12.)

The Estate has brought a claim against Defendants for alleged "ground contamination" caused by the Defendants operations at well sites located on the Estate Property, which are unrelated to hydraulic frac-

---

1. The Plaintiffs have also brought claims sounding in tort and contract, and these claims are also subject to pending motions for summary judgment. These motions will be addressed in a separate report and recommendation.

turing. (*Id.* ¶ 13.) The Estate has not made any claim for water contamination on the Estate Property caused by hydraulic fracturing or other drilling operations. (*Id.* ¶ 14; Deposition of Nolen Scott Ely as Executor of the Estate of Kenneth Ely ("Estate Depo."), App. Ex. F at 7:11–14, 85:18–19, 136:14–21.)

Similar to his father, on June 4, 2007, Nolen Scott Ely entered into an Oil and Gas Lease ("Ely Lease") with Cabot, as lessee, "for the purpose of exploring by geophysical and other methods, drilling, and operating for and producing oil, gas," and other minerals on his property, as defined in paragraph 1 of the lease ("Ely Property"). (Def. SMF ¶ 18; Keim Decl., App. Ex. A, Ex. B thereto at ¶ 1.) The record reveals that the Defendants have not conducted drilling operations on or under the Ely Property, but the Elys allege that their water supply is within 1000 feet of natural gas wells owned and operated by Cabot, namely the Gesford 3 and Gesford 9 gas wells. (Doc. 387, App. Ex. C, Depo. of Nolen Scott Ely ("Ely Dep."), at 111:5–14; Declaration of John Papso ("Papso Decl."), App. Ex. B at ¶ 18.) The Elys have retained the services of a hydrology expert, who has opined that the Elys water supply has been affected by Cabot's drilling operations in the area, and that the water supply "continues to detect levels of chemicals caused by Cabot natural gas drilling activity …" (Def. SMF ¶ 21, App. Ex. L, Report of Paul Rubin dated August 28, 2012 ("Rubin Report").) Rubin opines that unidentified "problems" with wells in Dimock "likely" led to the contamination of the [Elys'] water supply, and that consumption of the water "poses a threat to human health and the Plaintiffs should not be subjected to drinking such water." (Rubin Report, App. Ex. L, at 3–4.) The Elys claim that their water supply was affected by the Defendants' drilling operations in or around September 2008,

and claim that they have experienced headaches, upset stomachs, and rashes beginning around this time. (Def. SMF ¶¶ 25–27.) However, the Elys have not produced evidence to show how the Defendants drilling operations allegedly affected their water supply, and they have not provided medical expert testimony to support their claim that their alleged medical symptoms were related to constituents in their water supply. (*Id.* at 28.) Likewise, the Elys have not come forward with evidence to show that the have suffered or currently suffer from any personal injuries, or that they may in the future be expected to suffer personal injuries, related to Defendants' drilling operations. (*Id.* ¶¶ 28–30.)

On June 8, 2007, Ray and Victoria Hubert granted an Oil and Gas Lease ("Hubert Lease") to Cabot, as lessee, "for the purpose of exploring by geophysical and other methods, drilling, and operating for and producing oil, gas," and other minerals on their property, defined in paragraph 1 of the Hubert Lease. (Keim Decl., App. Ex. A, Ex. C thereto at ¶ 1.) As with the Ely Lease, Cabot has not conducted drilling operations on or under the Hubert's property. (Def. SMF ¶ 32, Deposition of Ray Hubert ("Ray Hubert Dep.", App. Ex. G at 55:5–8); Papso Decl., App. Ex. B, at ¶ 19.) In addition, the Huberts do not reside on the Hubert Property, and have not lived there for more than 22 years. (Ray Hubert Dep., App. Ex. G at 15:4–24; Deposition of Victoria Hubert ("Victoria Hubert Dep."), App. Ex. H at 16:3–13.) There is no water well located on the Hubert Property. (Victoria Hubert Dep., App. Ex. H, at 132:19–21.)

The Huberts live in a trailer on the Ely Property, and have done so for more than twenty years. (Ray Hubert Dep., App. Ex. G at 17:7–10.) Angel Hubert has not lived in the trailer since September 2009,

and did not live there when this civil action was initiated. The Hubert's minor child has lived in the trailer since she was born. (Ray Hubert Dep., App. Ex. G at 20:17–22.) The Huberts' water supply is a water well, located next to the trailer. (Ray Hubert Dep., App. Ex. G at 39:20–33; Victoria Hubert Dep., App. Ex. H, at 22:19–23:6.) The Huberts have alleged that their water supply is within 1000 feet of the Gesford 3 and Gesford 9 gas wells. (Second Am. Compl. ¶ 43(d).)

The Huberts allege that their water supply was adversely affected by the Defendants' drilling operations as early as 2007. (Ray Hubert Dep., App. Ex. G, at 118:21–119:3.) Although Huberts alleged that some family members suffered from rashes while suffering, the Huberts have not asserted claims for personal injuries, and further waived their claims for medical monitoring. (Def. SMF ¶¶ 42–43.)

Cabot began drilling the Gesford 3 gas well on or about September 25, 2008. (Papso Decl., App. Ex. B at ¶ 3.) The Gesford 3 gas well was temporarily plugged on or about October 9, 2008. (Id. ¶ 4.) Notably, the Gesford 3 well was never hydraulically fractured. (Id. ¶ 5.) On or about October 13, 2008, the rig that was used to drill the Gesford 3 wellbore was moved, or "skidded," to another location on the same well pad. (Id. ¶ 6.) On that same day, Cabot commenced drilling a second gas well, called the Gesford 3S. (Id. ¶ 7.) Cabot completed the drilling on the Gesford 3S gas well on or about December 17, 2008. (Id. ¶ 8.) The Gesford 3S gas well was hydraulically fractured in two stages, on or about March 20, 2009. (Id. ¶ 9.) In or about August 2009, the original Gesford 3 gas well was re-permitted and renamed as the Gesford 9 gas well. (Id. ¶ 10.) At that time, Cabot began drilling the Gesford 9 gas well in the location of the original Gesford 3 gas well. (Id. ¶ 11.) The Gesford 9 well was not drilled into the Marcellus Shale. (Id. ¶ 12.) Instead, it was drilled for production from a Devonian shale formation that is shallower than the Marcellus Shale formation. (Id. ¶ 13.) The total depth of the Gesford 9 well was 1911 feet. (Id. ¶ 14.) The Gesford 9 well was never hydraulically fractured, and was plugged and abandoned on or about May 23, 2010. (Id. ¶¶ 15–16.) The Gesford 3S gas well was also plugged and abandoned on or about May 23, 2010. (Id. ¶ 17.)

In the second amended complaint, which is the operative pleading in this action, the Plaintiffs allege, inter alia, that "hazardous chemicals and combustible gases used, processed, and stored by Defendants are of a toxic and hazardous nature capable of causing severe personal injuries and damages to persons and property coming in contact with them, and therefore are ultra hazardous and abnormally dangerous" and "the use, processing, storage, and activity of hydro-fracturing at Defendants' Gas Wells, adjacent to or on residential properties, was and continues to be an abnormally dangerous and ultra hazardous activity, subjecting persons coming into contact with the hazardous chemicals and combustible gases with severe personal injuries regardless of the degree of caution Defendants might have exercised." (Second Am. Compl., ¶¶ 85–86.)

In addition to these allegations regarding the allegedly exceptionally dangerous nature of these drilling operations, the Plaintiffs have claimed that they were personally injured as a result of the activities. Thus, the Plaintiffs have alleged that Defendants "caused the releases, spills, and discharges of combustible gases, hazardous chemicals, and industrial wastes from its various oil and gas drilling facilities" resulting in damage to the Plaintiffs' property and causing the Plaintiffs to incur what

they have alleged generally to be "health injuries." (*Id.*, ¶ 1.)

The Plaintiffs have offered limited evidence to help substantiate their claims that the Defendants' drilling operations in connection with the construction or operation of the Gesford 3S or Gesford 9 gas wells caused contamination of the Plaintiffs' water supplies. Notably, the plaintiffs have not submitted substantial evidence to support their claim that natural gas drilling operations, and hydraulic fracturing in particular, constitute ultra hazardous or abnormally dangerous activities. Instead, the Plaintiffs proffer the expert report from Anthony Ingraffea, who simply describes possible negligence and opines that fluid migration from the wells, to the extent it occurred, was "likely" due to a lack of due care relating to "faulty well design and/or construction." (Report of Anthony Ingraffea dated February 13, 2012 ("Ingraffea Report") at 7, App. Ex. K.) However, Ingraffea's report does not include expert testimony explaining that even proper drilling operations in the construction of natural gas wells, including the use of hydraulic fracturing, causes or is likely to cause contamination in water supplies, or other harm. In this regard, although Ingraffea's report focuses on *improper* well completion and faulty casing, or other negligent failings, it does not contain any explanation of, or identify any examples where a gas well was *properly constructed* and completed, and nevertheless fluid migration or water contamination occurred. Similarly, the Plaintiffs have not submitted evidence showing that the risks associated with natural gas drilling cannot be eliminated with the exercise of due care, and the Plaintiffs have not provided expert testimony to support their claim that the drilling operation of hydraulic fracturing has either affected the plaintiffs' water or property.

In contrast, the record contains a surplus of evidence not only attesting to the relative safety of natural gas drilling operations, but also to the fact that such operations are a common, growing, and important part of a modern, highly industrial society; that such operations have not been shown to have major adverse influences on water chemistry and rural drinking water supplies; that economic benefits realized from natural gas drilling operations are significant and have widespread impact on individuals and communities; and that to the extent there are environmental costs associated with natural gas drilling, they will continue to become progressively smaller as newer technology further mitigates the effect of drilling on the environment.

This evidence includes, *inter alia*, a report showing that since 1949, more than 2.5 million fracture treatments have been performed worldwide, and that since 2000, 649 wells have been drilled in Susquehanna County, Pennsylvania alone, 99.5% of which have been hydraulically fractured since 2009. (Def. SMF ¶¶ 70–72.) The Pennsylvania Department of Environmental Protection has permitted more than 9,800 wells in the Marcellus Shale alone since 2000, over 6300 of which are drilled or producing. (*Id.* ¶ 73.) In Dimock Township, where the Plaintiffs reside or own property, 97% of well permits issued since 2000 were for unconventional wells, or wells that are hydraulically fractured. (*Id.* ¶ 74.)

The record also includes a report from the Pennsylvania General Assembly showing that gas drilling operations did not appear to substantially influence water chemistry in areas near drilling activity. That same report underscored the widespread and established practice of oil and gas development within the Commonwealth, as it found that since dating to

1859, more than 350,000 natural gas wells have been drilled in Pennsylvania. Furthermore, the General Assembly report found that state requirements, including that gas wells be situated 200 feet from water supplies, were appropriate. (*Id.* ¶¶ 75–78; App. Ex. P, "The Impact of Marcellus Gas Drilling on Rural Drinking Water Supplies.")

In addition to matters of safety and the substantial and widespread growth of natural gas exploration and development that has taken place within the Commonwealth over many years, the record also contains substantial information attesting to the economic benefits that have been, and continue to be, realized from gas drilling operations. Thus, in August 2011, the Marcellus Shale Education and Training Center ("MSETC"), a collaboration of the Pennsylvania College of Technology and Penn State Extension, conducted a survey of Pennylvania Marcellus Shale landowners, local businesses, and local government officials, and then analyzed that data together with industry spending information and land ownership data, which was published in a report entitled "Economic Impacts of Marcellus Shale in Pennsylvania: Employment and Income in 2009" (the "MSETC 2009 Report"). (Doc. 387, App. Ex. Q.)

The MSETC 2009 Report found that the economic impact of Marcellus Shale development during 2009 ranged between 23,-385 and 23,884 jobs, and $3.1 and $3.2 billion in that year, including $1.2 billion in labor income, and almost $1.9 billion added to the Commonwealth's economy. (*Id.* at 5.) The MSETC 2009 Report also found that this significant economic impact was likely to continue into future years, and that much of the economic benefit was being felt in small counties. (*Id.*) The economic boon from natural gas drilling in the Commonwealth did not inure only to landowners and developers, but also to

state and local governments, which benefitted from impact payments and taxes assessed on royalties. During 2009, 28% of the businesses surveyed as part of the MSETC 2009 Report indicated that they had realized an increase in sales due to natural gas drilling, and the report further found that each new well drilled in the Marcellus Shale generated 30 jobs and $4 million in total output within Pennsylvania's economy. (*Id.* at 22–35.)

More recently, the MSETC studied county-level impact of Marcellus Shale activity in Susequehanna County in 2010, including analysis of industry reports on spending, employment data from the U.S. Bureau of Labor Statistics, land ownership information, landowner surveys, and the use of other tools to estimate economic multiplier effects resulting from natural gas drilling operations. The results of that study were published in a report titled "Economic Impacts of Marcellus Shale in Susquehanna County: Employment and Income in 2010" (the "MSETC 2010 Report"). (Doc. 387, App. Ex. R.) The MSETC 2010 Report states that Susquehanna County ranks fifth in the Commonwealth in terms of the number of Marcellus Shale wells located in Pennsylvania. (MSETC 2010 Report, App. Ex. R, at 5.) Significantly, between 2007 and 2009, royalty income increased by more than 800%, and helped to alleviate unemployment in the county, although the results in that area appear to have been somewhat modest. (*Id.* at 11.) Royalties and leasing income from natural gas drilling operations totaled more than $92 million in 2010, much of which benefitted farmers who used the royalty payments to make structural improvements to their farms and to upgrade farm implements. (*Id.* at 10–14.)

The Defendants have also offered information contained in a report produced by the Manhattan Institute generally attest-

ing to the economic benefits that have been, and will be, realized are significant and meaningful to the Commonwealth and its residents, and "far outweigh the environmental costs" that are associated with drilling.[2] (Doc. 387, App. Ex. S, Manhattan Institute Report.) This report also casts doubt on the suggestion that the water used in the hydraulic fracturing process could migrate from gas-bearing layers in the shale into water tables above, and asserts that such migration of fracking fluid "has never happened in over 60 years of hydraulic fracturing." (*Id.* at 7.) This assertion finds additional support in the record in the form of government and expert commentary from 11 oil and gas producing states, which maintains that hydraulic fracturing has never resulted in the contamination of drinking water supplies in more than 60 years.[3] (Doc. 387, App. Ex. Y, "State Regulators on Hydraulic Fracturing", available at http://www.energyindepth.org/wp-content/uploads/2011/07/EID_State–Regulators.pdf.) Defendants have identified other reports and analyses in which the authors submit that fracking does not pose the danger to aquifers as has been suggested by the Plaintiffs and others, while it has demonstrably resulted in economic benefit to individuals, businesses, local communities, and state government, and has resulted in more af-fordable energy costs for consumers. (Def. SMF 103–113.)

## III. *STANDARD OF REVIEW*

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Kreschollek v. S. Stevedoring Co.,* 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania,* 139 F.3d 386, 393 (3d Cir.1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.,* 16 F.3d 1346, 1349 (3d Cir.1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence

---

**2.** In referring to the record evidence submitted in this case, we intend only to present the record that the parties to this litigation actually developed. In this regard, nothing in this report should be taken as an indication that there is no longer any ongoing debate regarding the safety of natural gas drilling, hydraulic fracturing, or potential risks to water sources or other environmental interests as a result of gas drilling. The issue before the Court in this litigation is limited to whether natural gas drilling operations constitute ultra hazardous, abnormally dangerous activities that should be subjected to strict liability under Pennsylvania tort law. As discussed below, applying the facts and evidence sub-mitted in this case against the well-settled standards that govern whether an activity should be declared ultra hazardous, we conclude that neither the record nor the great weight of legal authority relevant to this issue could not support such a conclusion.

**3.** The Plaintiffs have identified reports from the Pennsylvania Department of Environmental Protection showing that there have been instances of water contamination relating to natural gas drilling activities, (Doc. 423, at 37), but this evidence does not establish that such harms were the unavoidable result of properly performed hydraulic fracturing.

to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also* Fed.R.Civ.P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990); *see also Gleason v. Norwest Mortg., Inc.,* 243 F.3d 130, 138 (3d Cir.2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial .... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.,* 972 F.2d 53, 55 (3d Cir.1992) (quoting *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548).

Where, as here, a party fails to address the other party's properly supported assertion of fact, the court may consider "grant[ing] summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it. . . ." Fed.

R.Civ.P. 56(e). Local Civil Rule 56.1(a) deems a movant's statement of material facts undisputed where a party does not respond or file a counterstatement. L.R. 56(a). A failure to dispute a party's statement of material facts, however, "is not alone a sufficient basis for the entry of a summary judgment." *See Anchorage Assocs. v. Virgin Islands Bd. of Tax Review,* 922 F.2d 168, 175 (3d Cir.1990) (holding that even where a local rule deeming unopposed motions to be conceded, the court was still required to analyze the movant's summary judgment motion under the standard prescribed by Fed.R.Civ.P. 56(e)); *see also Muskett v. Certegy Check Servs., Inc.,* Civ. No. 08–3975, 2010 WL 2710555 (D.N.J. July 6, 2010) ("In order to grant Defendant's unopposed motion for summary judgment, where, as here, 'the moving party does not have the burden of proof on the relevant issues, ... the [Court] must determine that the deficiencies in [Plaintiff's] evidence designated in or in connection with the motion entitle the [Defendants] to judgment as a matter of law.'" (quoting *Anchorage Assocs.,* 922 F.2d at 175)).

In this case, the parties essentially agree upon the relevant standard of review for summary judgment motions set forth above, insofar as those motions are brought in the traditional case, and agree that in those traditional cases where the evidence is in conflict, summary judgment is inappropriate and such evidentiary disputes must be resolved by the ultimate factfinder following trial.

The parties also are in agreement that the question of whether natural gas drilling and hydraulic fracturing constitute abnormally dangerous activities, and thus give rise to strict liability under Pennsylvania law, is a question of law that must be answered by the court. Nevertheless, despite their agreement on these issues, the

Plaintiffs insist that the Court should defer ruling on the threshold question of whether the Defendants' activities give rise to strict liability, presumably until trial, because the Plaintiffs have identified *some* evidence that they believe supports their contention that strict liability should apply. We disagree.

It is telling that the Plaintiffs do not cite to a single case that supports their assertion that the Court must refrain from ruling on a motion for summary judgment in this particular context, merely because some "fact issue" may exist with respect to one of the six factors deemed relevant to the Court's decision of whether strict liability should apply. Courts within this and other districts have found that it is indeed appropriate for courts to resolve such issues at the summary judgment stage. *See Fiorentino v. Cabot Oil & Gas Corp.*, 750 F.Supp.2d 506, 512 (M.D.Pa.2010); *see also Kamuck v. Shell Energy Holdings GP, LLC*, No. 4:11–CV–1425, 2012 WL 1463594, at *12, 2012 U.S. Dist. LEXIS 59113, at *39–40 (M.D.Pa. Mar. 19, 2012) (refraining from determining the issue on the pleadings, but recommending that the district court reconsider the issue "through a dispositive summary judgment motion at the close of discovery" after an "adequate factual record has been developed to permit informed judicial decision-making") (recommendation adopted in part and rejected in part by 2012 WL 1466490, 2012 U.S. Dist. LEXIS 59093); *Berish v. Southwestern Energy Prod. Co.*, 763 F.Supp.2d 702, 706 (M.D.Pa.2011) (denying a motion to dismiss under Rule 12(b)(6) because a decision on whether strict liability should apply to claims "usually comes after discovery is completed, in a ruling on a Motion for Summary Judgment"). Other courts are in accord, and have found that they are empowered to determine whether strict liability should apply to a defendant's activity upon a motion for summary judgment. *See Banks v. Ashland Oil Co.*, 127 F.Supp.2d 679, 681 (E.D.Pa.2001); *see also Roth v. Norfalco*, No. 1:06–CV–1452, 2008 WL 859267, at **3–5, 2008 U.S. Dist. LEXIS 24869, at **9–14 (M.D.Pa. Mar. 28, 2008).

We agree with these decisions, and conclude that it is appropriate and proper to resolve the "questions of law" that are dependent upon "social policy" upon the pending motion for summary judgment, *Azzarello v. Black Bros. Co., Inc.*, 480 Pa. 547, 391 A.2d 1020, 1025–26 (1978), regardless of the fact that the Plaintiffs may have identified some evidence that they believe has created a disputed issue of fact on this threshold, and important, question.

## IV. DISCUSSION

In considering the parties' competing views of the nature of strict tort liability in this particular field, we do not write upon a blank slate. Quite the contrary, a number of cases have examined the application of the doctrine of strict tort liability in this setting. *See e.g., Tucker v. Southwestern Energy Co.*, No. 11–44, 2012 WL 528253 (E.D.Ark. Feb. 17, 2012); *Berish v. Southwestern Energy Production Co.*, 763 F.Supp.2d 702 (M.D.Pa.2011); *Fiorentino v. Cabot Oil & Gas Corp.*, 750 F.Supp.2d 506 (M.D.Pa.2010). From these cases, a legal consensus has emerged.

First, it is generally agreed that Pennsylvania recognizes a strict liability cause of action in tort for abnormally dangerous and ultra hazardous activities. *See Berish v. Southwestern Energy Production Co.*, 763 F.Supp.2d 702 (M.D.Pa.2011); *Fiorentino v. Cabot Oil & Gas Corp.*, 750 F.Supp.2d 506 (M.D.Pa.2010). In this regard:

> [T]he Superior Court of Pennsylvania, in several cases, has adopted Sections 519 and 520 of the Restatement (Second) of

Torts for determining whether an activity is abnormally dangerous. *See, e.g., Diffenderfer v. Staner,* 722 A.2d 1103, 1107 (1998) (adopting §§ 519 and 520 of the Restatement(Second) of Torts); *Melso,* 576 A.2d at 1002–03 (same); *Smith v. Weaver,* 445 Pa.Super. 461, 665 A.2d 1215, 1219–20 (1995) (same); *Albig,* 502 A.2d at 662–63 (same).

Section 519 of the Restatement states, in pertinent part, that "[o]ne who carries on an abnormally dangerous activity is subject to liability for harm … of another resulting from the activity, although he exercised the utmost care to prevent the harm." Restatement (Second) of Torts § 519(1) (1977); *see also Diffenderfer,* 722 A.2d at 1108 (1998) (applying this part of the Restatement). Section 520 enumerates a list of factors the court should consider in determining whether an activity is abnormally dangerous. These factors are as follows: (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts §§ 520 (1977).

*Banks v. Ashland Oil Co.,* 127 F.Supp.2d 679, 680–681 (E.D.Pa.2001).

■ Applying the Restatement's multi-faceted test, courts agree that the question of whether a specific activity is abnormally dangerous and, thus, gives rise to strict tort liability, is a question of law for the court to resolve. *See e.g., Tucker v. Southwestern Energy, Co.,* No. 11–44, 2012 WL 528253 (E.D.Ark. Feb. 17, 2012); *Berish v. Southwestern Energy Production Co.,* 763 F.Supp.2d 702 (M.D.Pa.2011); *Fiorentino v. Cabot Oil & Gas Corp.,* 750 F.Supp.2d 506 (M.D.Pa.2010); *Banks v. Ashland Oil Co.,* 127 F.Supp.2d 679, 680–681 (E.D.Pa. 2001). However, "since the determination of whether or not an activity is abnormally dangerous is fact-intensive, courts often wait until discovery is complete before making this determination. *See Norma J. Fiorentino, et al. v. Cabot Oil & Gas Corp.,* No. 09–cv–2284, 750 F.Supp.2d 506, 2010 WL 4595524 (M.D.Pa. Nov. 15, 2010)." *Berish v. Southwestern Energy Production Co.,* 763 F.Supp.2d 702, 705 (M.D.Pa.2011).

Furthermore, we are mindful of the fact that, as a federal court exercising diversity jurisdiction, we are obliged to apply the substantive law of Pennsylvania to this dispute. *Chamberlain v. Giampapa,* 210 F.3d 154, 158 (3d Cir.2000). In this regard, we are constrained to observe that Pennsylvania courts have frequently rebuffed efforts in other closely-related factual contexts to label various oil and gas production activities as ultra-hazardous activities giving rise to strict tort liability. *Melso v. Sun Pipe Line Co.,* 394 Pa.Super. 578, 586, 576 A.2d 999, 1003 (1990) ("The court below erred, in our opinion, in determining that the operation of a petroleum pipeline under Newtown Crossing was an abnormally dangerous activity."); *Smith v. Weaver,* 445 Pa.Super. 461, 470, 665 A.2d 1215, 1219 (1995)(underground storage tanks do not constitute an abnormally dangerous or ultra-hazardous condition on property). Therefore, the plaintiffs essentially invite us to predict that the Pennsylvania courts will take a step which they have, thus far, steadfastly refused to take,

and characterize oil and gas production activities as ultra-hazardous.

In this case the discovery process is now closed, and the parties have presented evidence and argument that they respectively contend support their positions regarding whether natural gas drilling activities, including hydraulic fracturing, constitute abnormally dangerous activities under Pennsylvania law giving rise to strict liability. In accordance with the foregoing, we will consider this competing evidence, guided by the six factors identified in the Restatement, and assessing the state of the law on this issue in Pennsylvania.

### A. Whether Natural Gas Drilling Operations Present a High Degree of Risk of Harm

With respect to the first factor to be considered, we agree with the Defendants that the law in this field emphasizes that whether an activity presents a high degree of risk should not focus on whether the Defendants acted negligently, but instead should remain focused on whether the activity itself is abnormally dangerous. *See Smith v. Weaver,* 445 Pa.Super. 461, 665 A.2d 1215, 1219 (1995) (rejecting the plaintiffs' argument that the court should focus "not whether underground tanks are abnormally dangerous, but rather whether underground storage tanks which are leaking a hazardous substance are abnormally dangerous" since such analysis would require courts to "view the results of the activity, instead of the activity itself."); *see also id.* ("Although a dangerous condition may have later developed, or harm may have occurred, the proper focus is on the activity itself.").

 Viewed in this way, the Plaintiffs have not carried their burden of showing that natural gas drilling activities are abnormally dangerous. As discussed at greater length in the background section

of this report, the evidence in the record developed by the parties contains numerous citations to governmental reports, data analysis, and expert commentary attesting to the Defendants' position that the risks from a properly drilled, cased and hydraulically fractured gas well are minimal. This evidence includes a report from the Pennsylvania General Assembly that referred to a study examining more than 200 water samples taken before and after drilling and hydraulic fracturing that revealed no major influences from gas well drilling or fracking. (Def. SMF ¶ 78.) The evidence also indicates that Pennsylvania's Department of Environmental Protection concluded that problems associated with natural gas drilling, to the extent they exist, "can be mitigated by proper construction of gas wells." (*Id.* ¶ 101.) Other evidence from within Pennsylvania and other states in which natural gas drilling occurs further supports the view that hydraulically fractured wells create, at most, relatively low risk to water supplies, and the Director of the DEP's Office of Oil and Gas Management attested that following a "million experiments" from across the country, he had not found any instances of fracking interfering with groundwater resources. (*Id.* ¶¶ 111–112.)

The foregoing evidence does not, we submit, entirely close the door as to whether natural gas drilling activities may present significant environmental risks when they are negligently undertaken. Indeed, instead of focusing on the inherent dangers that they claim are presented by natural gas drilling, the Plaintiffs endeavor to support their strict liability claim by pointing to opinions of their experts and mere argument in support of their view that hydraulic fracturing is unusually dangerous. The Plaintiffs have also selectively plucked language from a 10–K report that Cabot filed with the Securities Ex-

change Commission pursuant to Section 12(b) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2008, in which Cabot highlighted for investors and the public potential financial risks to the company resulting from their business activities, but these selective quotes taken from this corporate document do not demonstrate that gas drilling operations, and hydraulic fracturing in particular, are abnormally dangerous. Moreover, the quotes do not, as the Plaintiffs seem to suggest, form some sort of acknowledgment that gas drilling operations "inherently carry the existence of a high degree of risk" to people or property.[4] (Doc. 423, at 32.)

The Plaintiffs also observe that courts have yet to answer the question of whether modern fracking techniques are abnormally dangerous, but in doing so that Plaintiffs do not effectively support their contention that properly conducted hydraulic fracturing and other natural gas drilling activities at issue in this case are abnormally dangerous, and we do not find that there is sufficient evidence in the Plaintiffs' favor on this point. Again, the Plaintiffs and their purported experts concentrate their arguments on the alleged results of the activity in this case, and not on the activity itself. This misplaced focus, coupled with a lack of evidence and case law to support the Plaintiffs' position causes us to find that this first factor favors the Defendants' in this case.

**B. Whether the Plaintiffs Have Shown a Sufficient Likelihood that Harm Resulting From the Defendants' Gas Drilling Operations Will Be Great**

The Plaintiffs also focus on the manner in which the Defendants conducted their drilling operations in an effort to establish the second relevant factor identified by the Restatement, namely, that any resulting harm from gas drilling operations will be great. We have already noted that such a focus is improper and inadequate to support the Plaintiffs' burden, since the focus of our inquiry is limited to whether the risk of harm from properly conducted drilling operations will be great. On this relevant factor, which courts have declared "pales in comparison to the others" in cases where the activity at issue is common and the use of due care can reduce risk of harm, *Smith*, 665 A.2d at 1220, the evidence does not support the Plaintiffs' position. None of the Plaintiffs' experts offer an opinion that speaks to whether the likelihood of harm from Defendants' properly conducted gas drilling operations will be significant. In contrast, as discussed at length above, there is substantial evidence offered in support of the Defendants' view that proper gas drilling techniques mitigate risks, and such risks while already low will continue to be mitigated as the industry develops further safety precautions.

---

4. Notably, as Cabot observes, the same sorts of risks are identified elsewhere in Cabot's 10–K with respect to the company's "natural gas gathering and pipeline systems," and these are activities that courts have held are not abnormally dangerous. *See Melso v. Sun Pipe Line Co.*, 394 Pa.Super. 578, 576 A.2d 999, 1003–04 (1990); *see also Henke v. Arco Midcon, L.L.C.*, 750 F.Supp.2d 1052, 1059 (E.D.Mo.2010); *Fletcher v. Conoco*, 129 F.Supp.2d 1255, 1261 (W.D.Mo.2001). The

Defendants further amplify this point in their reply brief, identifying the types of risks identified in Cabot's 10–K that are applicable to other industries and activities, such as underground gas storage, venting of natural gas, drilling of a monitoring well around underground storage tanks, and the storage and disposal of methane gas. (Doc. 438, at 6) (collecting cases holding that such activities are not abnormally dangerous).

The only support the Plaintiffs have identified for their view that the hydraulic fracturing presents a likelihood that resulting harm will be great comes from a case involving surface blasting, which the Pennsylvania Supreme Court has held to be an ultra hazardous activity. *See Federoff et ux. v. Harrison Constr. Co.,* 362 Pa. 181, 66 A.2d 817 (1949). But the Plaintiffs do not persuasively explain why the holding of that case, which involves activity involving the use of explosives on the surface that are by definition intended to cause destruction of property, is analogous to modern fracking techniques that occur thousands of feet below the surface. We do not find this distinguishable authority, decided in a quite different industrial context, is sufficient to support the Plaintiffs' argument on this second prong of the Court's analysis.

### C. Whether the Exercise of Due Care Can Eliminate Risks Posed By Drilling Operations

With respect to this next factor, although we do not read the evidence in the record to conclude that all risk of harm is absolutely foreclosed by the exercise of due care, the great weight of the evidence that the parties have submitted indicates that such risks are substantially mitigated when due care is exercised. The Plaintiffs have concentrated their argument by offering a report from Anthony Ingraffea, their Rock Engineering Expert, but even this expert acknowledges that the fluid migration that the Plaintiffs have alleged interfered with their water supply was "likely" owing to negligence on the Defendants' part through "faulty well design and/or construction." (Def. SMF ¶ 63.) This focus on negligent conduct undermines the Plaintiffs' assertion that Ingraffea's report supports their view that even the exercise of due care cannot eliminate risks.

We are also unable to embrace the Plaintiffs' logically flawed suggestion that if all danger from drilling could be eliminated, there would be no need for DEP enforcement in the gas drilling industry. (Doc. 423, at 37.) Essentially, the Plaintiffs assert that because the DEP has identified some instances where oil and gas drilling activities may have damaged water supplies, this should be taken as conclusive proof that even if due care is taken, risk cannot be eliminated. But what the Plaintiffs' argument would mean, taken to its logical conclusion, is that any time an industry causes any harm of any kind, their activities should be judged against a strict liability standard. This simply is not the law in Pennsylvania or, to the best of this Court's knowledge, any state.

In contrast, the Defendants have pointed to evidence in the form of reports by the Manhattan Institute showing that proper drilling techniques have substantially mitigated the risks that drilling might have presented, and that these risks will become further diminished as new technologies are used. (Def. SMF ¶ 102.) Although there appears to be some indication in the record that risks may exist, and it is undisputed that the DEP has identified instances where drilling operations caused harm, the weight of the evidence indicates that such risks may be substantially reduced through the exercise of due care in this field.

### D. Whether Gas Drilling Operations are Common in Dimock Township, Susquehanna County, Pennsylvania

The Plaintiffs maintain that hydraulic fracturing of the type at issue in this case was "novel" in Dimock Township until around the time it was introduced within the past 10 years. This spare assertion

does not acknowledge that since 2000, more than 170 gas wells were permitted in the 29 square miles that comprise the Township, and that over 1,100 such wells have been permitted in Susquehanna County during the same period. (Def. SMF ¶¶ 73–74.) Significantly, since 2009, 99.5% of these wells have been hydraulically fractured. (*Id.* ¶ 72.) During this time, the Commonwealth has permitted more than 9,800 wells throughout Pennsylvania. (*Id.* at 73–74.) In the face of this widespread and growing area of industrial activity and natural resource development, it is difficult to credit the Plaintiffs' suggestion that natural gas drilling, and hydraulic fracturing, is a "novel" activity. Pennsylvania has had a long history with the commercial exploitation of oil and natural gas resources, and since 1859 more than 350,000 wells have been drilled in the Commonwealth. (Def. SMF ¶ 77.) The evidence indicates that this longstanding, prevalent activity is now common, and becoming increasingly part of the economic fabric of rural communities such as those found in Susquehanna County, this fourth factor weighs against a finding that strict liability is appropriate in this case.

### E. Whether the Defendants' Gas Drilling Operations are Conducted in Appropriate Areas

Despite entering into leases with the Defendants authorizing them to engage in natural gas exploration on their respective properties, the Plaintiffs argue in this case that the Defendants have conducted their drilling operations in inappropriate areas. Specifically, the Plaintiffs assert that the Defendants have conducted their drilling activities in too close proximity to the Plaintiffs' water resources.

Notably, the parties are in agreement that the Pennsylvania General Assembly has issued a report in which that legislative body concluded that the current standards for the placement of gas wells in relation to other structures and environmental areas, including a requirement that wells be located at least 200 feet away from water supplies, are appropriate. (Def. SMF ¶ 78.) That study concluded that there was insufficient evidence to support a change in this setback requirement. The General Assembly's conclusion in this regard dovetails with judicial decisions and expert commentary that gas drilling operations in rural areas area appropriate when they are subject to setback requirements. *See Robinson Twp. v. Commonwealth of Pennsylvania,* 52 A.3d 463, 487 (Pa. Commw.Ct.2012); RESTATEMENT (SECOND) OF TORTS § 520, cmt. k (1977).

The parties also are in agreement that Defendants' drilling operations conformed to setback requirements for their wells, all of which the DEP permitted. We thus cannot embrace the Plaintiffs' assertion that wells drilled in accordance with valid leases, and which were permitted by the Commonwealth's environmental regulatory body, and which otherwise complied with legal requirements with respect to setback limits, were nevertheless placed inappropriately.

### F. Whether the Economic Value to the Community Outweighs Any Dangers Posed By Gas Drilling Operations

Lastly, we are directed to consider the economic value of gas drilling operations, and to weight any such value against the potential dangers that may result from the activity. *Albig v. Municipal Authority of Westmoreland County,* 348 Pa.Super. 505, 502 A.2d 658, 663 (1985). In *Albig,* the Superior Court indicated that this factor is particularly important in an assessment of whether an activity is subject to strict liability, observing that even if the activity

"involves a serious risk of harm that cannot be eliminated with reasonable care and it is not a matter of common usage, its value to the community may be such that the danger will not be regarded as an abnormal one." *Id.* This observation is echoed in the Restatement, which notes that when the challenged activity is central to a community's economic well-being, its value is a particularly important factor in the analysis. Restatement (Second) of Torts § 520, cmt. k (1977). In this case, the evidence marshaled by the parties is decidedly in the Defendants' favor, as they have highlighted benefits to Dimock Township and Susquehanna County stemming directly from natural gas drilling, and they have identified statistics showing that this industrial activity has benefits that extend throughout the Commonwealth, affecting individuals, businesses, local communities, and government. We acknowledge the Plaintiffs' argument that natural gas drilling is frequently attended by "booms and busts," and that "the jury is out on who benefits economically" from this activity. Nevertheless, review of the evidence submitted by the parties tilts this factor in Defendants' favor.[5]

In the background to this report, we discussed the various economic benefits that have been shown to flow from natural gas drilling in Susquehanna County and throughout the Commonwealth. The evidence in this case reveals that some of these benefits include:

- Since 2006, Susquehanna County has the fifth largest number of Marcellus Shale wells in the Commonwealth of Pennsylvania. (Def. SMF ¶ 71, 86.)

- The Elk Lake School District, which has two producing gas wells on its property, receives between $40,000 and $60,000 in royalties each month, helping the school district to operate without raising property taxes. (*Id.* ¶ 104.)

- Royalty income in Susquehanna County increased by 805% in Susquehanna County between 2007 and 2009. (*Id.* ¶ 88.)

- Susquehanna County landowners received $92.1 million in leasing income in 2010. (*Id.* ¶ 92.)

- An increase in hiring and wages paid in Susquehanna County has been attributed to growth in gas drilling jobs. (*Id.* ¶ 90.)

- Royalties from natural gas drilling have been used by farmers to improve their buildings and purchase new farm implements. (*Id.* ¶ 93.)

- Susquehanna County received more than $4 million in impact fee revenue paid by gas drilling companies in 2011 alone. (*Id.* ¶ 105.)

- In 2009, natural gas drilling accounted for more than 23,000 new jobs and a $1.2 billion increase in labor income in the Commonwealth. (*Id.* ¶ 80.)

- Landowners in Pennsylvania receiving lease payments have paid 17% of the amount received to state and federal government in taxes. (*Id.* ¶ 82.)

5. We do not reject out of hand the Plaintiffs' argument that the economic benefits of natural gas drilling should be considered against the costs that such activity imposes on local communities, and the strains that may be felt by local infrastructure, emergency services, law enforcement, and pressure on property values. While these social considerations are properly being debated in the media and numerous public fora, and although a thorough assessment of the benefits and burdens of drilling activity should no doubt be balanced and critical, we emphasize that the actual evidentiary record on this point, as presented by the parties, provides more support for the Defendants' assertion that the economic benefits from drilling are substantial and widespread.

- In Pennsylvania, 239,000 jobs are tied to the natural gas industry. (*Id.* ¶ 107.)
- Customers purchasing natural gas have saved an average of more than $3200 on heating bills as a result of an increase in natural gas production. (*Id.* ¶ 110.)

Courts have found that these kinds of economic benefits, and savings to individuals and communities, are relevant to whether a particular activity's economic value outweighs potential danger. *Diffenderfer,* 722 A.2d at 1108. In the face of these economic benefits, the Plaintiffs have failed to identify sufficiently compelling countervailing evidence that could allow the Court to find that this factor favors the Plaintiffs' position.

## V. CONCLUSION

Following a review of the record and the parties' arguments with respect to the six-factor test outlined above that courts use to determine whether an activity should be subjected to strict liability, and viewing this issue through the prism of Pennsylvania law, we find that the natural gas drilling activities challenged in this particular case are not abnormally dangerous, and strict liability should not apply. Our conclusion in this regard is in line with precedent in this field within Pennsylvania, as courts have routinely declined to find that activities relating to oil and gas drilling are abnormally dangerous. *See Melso,* 576 A.2d at 1003–04 (operation of pipeline in heavily populated urban area not abnormally dangerous); *Smith,* 665 A.2d at 1219 (storage of gasoline underground not abnormally dangerous, since it could be done safely, was common, and valuable to society). This conclusion is also in accord with legal authority in other jurisdictions, where courts have reached similar conclusions on the facts presented in those cases. *See Indiana Harbor Belt R. Co. v. Am.*

*Cyanamid Co.,* 916 F.2d 1174, 1181 (7th Cir.1990) ("Natural gas is both flammable and poisonous, but the operation of a natural gas well is not an ultrahazardous activity."); *Williams v. Amoco Prod. Co.,* 241 Kan. 102, 734 P.2d 1113, 1123 (1987) ("[The] drilling and operation of natural gas wells is not an abnormally dangerous activity.").

Yet, while we find that the Plaintiffs have failed to support their assertion under Pennsylvania law that the Defendants' gas drilling operations represent abnormally dangerous activities, we note that this conclusion does not mean that parties are wholly foreclosed from addressing concerns in this field through the courts. Rather, the Plaintiffs' claims for property damage and personal injury should be considered under traditional and longstanding negligence principles, and not under a strict liability standard.

## VI. RECOMMENDATION

For the foregoing reasons, IT IS HEREBY RECOMMENDED THAT the Defendants' motion for summary judgment on the Plaintiffs' claims for strict liability (Doc. 386) should be GRANTED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is

made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 9th day of January, 2014.